Good morning, Your Honor, and may it please the Court. In the end, Ingram's position today is simple. We're here to ask for your ruling that fault for an elision can be apportioned to the owner of even a lawfully constructed bridge if the finder of fact determines that it is unreasonably narrow. Now, the trial judge ruled to the contrary in this case. And respectfully, he got it wrong because, number one, an owner has a duty to act with reasonable care to protect its own property, the breach of which is subject to apportionment of fault. Number two, that duty is not removed by the holding of a valid construction permit. And third, these errors of law necessarily prejudiced the judge's ultimate finding of fact and causation that the cruise negligence was the sole cause of the accident and should therefore be reversed. So I'd like to address each of these three in turn if I could, beginning with the duty and fault questions. The trial judge ruled at page 13 that he could not apportion fault to DME because it had no duty to alter the bridge as a matter of law. But a reduction in damages to a bridge owner's own property may be appropriate, even if there is no duty to a third party. And S.C. Loveland out of the Fifth Circuit says it better than I could, so I'll indulge in a brief quote. We thus reject the state's argument that it breached no duty to those who owned or were responsible for the barge. Contributory negligence resulting in a diminution of damages otherwise recoverable may exist even though there be no breach of the duty to another. One may be guilty of negligence in the care of one's own property and thus suffer a reduction of recoverable damages even though such negligence would not be actionable in a claim by another. And in this case, of course, Ingram has not sued the bridge owner. So apportionment applies and a vessel owner may present evidence that a bridge was an unreasonable obstruction to reduce its share of the fault, even if it could not sue the bridge owner for damages. Can you I know it's in your briefs, but can you really tell clearly which way the judge ends up going? Because by the end of this, the judge makes it sounds like it's a credibility case and it's a sole cause case. And so just to finish my thought. So therefore, even if the judge erred about the order and even if the judge erred almost on some of his talk about the duty, is that not determinative in this case? Our position there, Judge, is that the trial judge only addressed the cruise conduct after his mind was made up and he had said so. He said, as a matter of law, I cannot assess fault to the bridge owner and then uses the word moreover at page 13. Moreover, I find that the cruise negligence was the sole cause. So our position is he's entering that assessment already prejudiced and really locked in to where it's impossible for him to apportion fault. Moreover, is that not sort of an alternative alternatively? Moreover, regardless, I suppose it could be. And yet he chose to address the law and he has left us now with a. A pronouncement of law, and we believe it's new law and that takes us to the permitting issue. But that's why, again, it's so important. And I think he made clear that he was deciding first the legal question and then addressing in addition or alternatively the fact question. And we think necessarily then that was a prejudiced decision. Well, if you go to page 14 where the moreover is. The previous paragraph starts out really good, quoting the Supreme Court. But you're quite correct that by the end of it, it does look it has a. However, this is an ornament ornaments on the front of sentences opinion. So it has the ornament. However, no legal duty. And then it says moreover. So how did what do you how do you answer Judge question about Judge Kelly's question about it? What it means? What moreover means? Well, Judge, I would just have to return to the judge's pronouncement that he could not, as a matter of law, assess fault against the bridge owner as a matter of law. Well, of course, it ends with simply because the bridge does not meet modern standards. Right. Then no legal duty does that. Right. And then if I could turn to the permitting question and his basis for doing that, of course, you said clearly was the absence of I'm sorry, it was the presence of a valid construction permit. But Kirby does not say that a permit absolves the bridge owner or removes the question of comparative fault. Kirby and I in. I mean, you have to you have to make two assumptions here. One is that he made a legal error. So let's give you that for a moment. But then you also have to say the legal error influenced the ultimate decision because he says on page 15, you were based upon the testimony of your own witnesses. That you were you had who he finds to be, in his words, entirely credible. I conclude that the sole cause was the negligence of the barge operator. So what's what's the point of sending it back if he's already determined that that there's no comparative fault? This is so cause. Well, Your Honor, this circuit has ruled that this court has the power to correct errors of law, including a finding of fact that is based on a misunderstanding of the law. And we believe it's impossible to separate the two in this case. And it's also impossible factually to separate the role that the bridge played in causation from that the crew played. Because every turn in the testimony, in the arguments, what we are always addressing is the attempt to deal with the narrow width of this bridge. So factually and legally, we believe that the two rulings cannot be separated. And the reason he got there, again, was because of the holding of construction permit. Kirby and INM both instructed the trial court to determine the bridge's fault. And they did so knowing that it was lawfully permitted in each case. You think the magistrate got the law right, right? The United States magistrate judge? We do, Your Honor. Does the district judge ever refer to the magistrate judge? He does not. I didn't think so. Go ahead. And, Judge, the Kirby panel took great care to reconcile its holding with that of INM out of the Seventh Circuit and sided with approval of the INM holding that the unreasonable 1880 design of the Cebula Bridge could bear responsibility for an elision under principles of comparative fault. Again, saying this while knowing that the bridge has a valid construction permit, which is, of course, based on the bridge's design. Now, Kirby at 678 sided with approval of the Wilmington case out of the Fourth Circuit, which held specifically that although the bridge in that case was a lawful obstruction, that the owner's design had chosen to leave little, if any, margin of safety. And land-based tort law does not support this sort of an argument that holds that a permit absolves a property owner of fault. What we see instead is that a permit supplies a minimum standard, but where a permitted design is causing foreseeable accidents, reasonable care may require more than mere permit compliance. This court has addressed exactly this question in Carl v. Burlington, rejecting a railroad's arguments very similar to those here, although in a land-based context, that it had no duty under the common law to upgrade its crossing because the crossing was a regulated design and the railroad was not out of compliance with any sort of regulation or law. This court explained, quote, it is well established, however, that compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions. That's this court quoting the restatement second at 288C and noting its adoption by courts nationwide under similar circumstances. Again, that's a land-based ruling, but to hold otherwise in the context of bridges, we believe, would be bad law and bad practice. Now, the other reason, apparently, that the trial judge got here is based on a quote out of the Supreme Court case in Sierra Club. Your Honor, we don't believe that Sierra Club supports this argument at all. Sierra Club is a case addressing the question of whether a federal statute implied a private cause of action to stop construction of a bridge, that being the Rivers and Harbors Appropriation Act. But the tort law duty to exercise reasonable care has been present in maritime common law from the beginning. And indeed, the trial judge in this very case confirmed our research in the sense I could not find any other court that applied Sierra Club in this manner. And the trial judge in our case had ruled previously at docket number 36 in denying in part DME's motion in limine to exclude our expert. He stated that Sierra Club was not applicable. He said, thus, Sierra Club establishes that there is no federal common law prohibiting obstructions and nuisances in navigable waters. However, the lack of such common law authority does not preclude a finding that a bridge owner may be at fault in an elision case. That's our judge in this very case. He changed his mind later on after trial. But we think he had it right when he addressed it the first time. And my third point deals with the effect of these errors. We've already addressed that to some extent. But we also believe that the trial judge compounded his error by expressly continuing to apply the Oregon presumption against the vessel owner even as he turned to address the crew's negligence. And the presumption under maritime law is supposed to disappear according to the Fifth Circuit and the Seventh Circuit. It's not an ultimate finding. It disappears on proof of the bridge owner's fault, on presentation of evidence of the bridge owner's fault. It's not to be a make-weight in the evidence tipping the scales. Rather, it merely satisfies the prima facie case. It's not a presumption with regard to percentages of fault or with regard to sole fault, which is how the trial judge applied it here. And it's not a presumption of causation. The trial judge told us in a footnote that he was still weighing that Oregon presumption against the owner of the moving vessel as he assessed the crew's fault. And so under Mann, we suggest that the trial court should apportion fault to both parties. That this court should instruct the trial judge to consider whether DME acted with reasonable care to protect its own property and should consider the Coast Guard's findings and order as evidence that the bridge was an unreasonable obstruction. I'll just close with a quote from City of Chicago out of the Seventh Circuit, which again involved a lawfully permitted bridge. Quote, therefore, under the comparative fault analysis between a vessel and a stationary object, a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury if occurred. And we ask that the court declare this to be the law in this circuit. Thank you. Thank you, counsel. Mr. Decoder? Good morning and may it please the court. The DM&E respectfully requests that this court affirm Judge Strand's ruling on the basis that there is no clear error in his finding of sole causation because of negligence of the crew and negligence of Ingram. Furthermore, Judge Strand correctly ruled that the DM&E cannot be apportioned any fault under applicable law. With regard to the factual findings... Well, is that inconsistent with the Seventh Circuit? Would we be creating a split over the very same bridge that the Seventh Circuit was dealing with? The Seventh Circuit, Your Honor, held that, according to the Kirby court, that the presumption that the court could consider in determining the negligence of the pilot, the facts of the Truman-Hobbs report and what those facts are. Now, that's the way that Kirby interpreted I&M Rail Link. I would frankly say that I believe that Kirby already diverges from I&M Rail Link. I don't think we're creating anything new if we follow Kirby. Kirby is, in fact, the law in this circuit. I&M Rail Link was a deviation, in my opinion, from what the law should be. So I would say, yes, there is some disagreement there. Do you agree Kirby says you're supposed to look at the, let the Coast Guard's order to alter be evidence? You're supposed to look at it and consider it? And the judge did so, Your Honor. Well, how do you... You know the quotes. You've seen them. We've talked about them already. How do you get around this language that these statements are just wrong, especially the other evidence? Other means something different. It says, I find the order to alter does not rebut. It's free to argue that other evidence rebuts. It should have said other evidence, comma, including the order to alter, and it doesn't. Well, we're engaging a little bit of mind reading there with the judge. No, no, no, no, no. We read words on a page, and it says other evidence. How do you get around the other evidence? Because the judge went beyond the discussion of presumptions. Judge Strand was talking about the Oregon presumption and the applicability of it. In that section of his opinion, that's what he was considering. But he went on. As you correctly noted, you said, moreover, I am making findings of fact. Well, you've got to skip to the next ambiguity. I gave you the worst one for your side, the other evidence. That's the second worst one. What do you think moreover means? Moreover means in addition. In addition, I find, even though I've already discussed the Oregon presumption, he is making findings of fact based on the facts of this case without resort to the presumption under the Oregon rule. He is saying that there was pilot error here. He is saying that under the circumstances of this case, that width, the narrowness of this bridge, should not have been a factor. This pilot did not approach the bridge correctly. He was not supervised correctly. He had a light tow. River conditions were normal. Weather was normal. Under those facts and circumstances, the sole causation is the negligence of the pilot. Notwithstanding the narrowness of the bridge, the pilot should still have been able to clear it. Well, another way you could read the order, though, was, first of all, I can't assess any liability against DME because he says he can't. He says DME cannot be assessed any share of fault simply because the bridge does not meet modern standards. So then the question becomes, well, is the barge company at fault? Maybe there are incidents where nobody is at fault. So now he's got to say, well, has the barge company got any liability? I don't know. I'm having trouble envisioning something where nobody would be at fault, but in tort law, that's what you have to decide. Lisa. Sure. And I think part of the issue here, as you can see on the photograph that Judge Strand included in his opinion, this accident occurs 150 feet directly south of the center pier. The port lead barge hit right at the end. Port, you mean left, right? Left, correct. Go ahead. The left lead barge hit at the end of that pier. This pilot was so far off course that he was virtually into the Iowa Channel. Well, I'm just talking about the word moreover. I'm not disputing that his finding of negligence is clearly supported by the record. And you might even argue that had he, I'm not saying he applied the wrong standard, but assuming he had applied the correct legal standard, I think the barge company would have a tough boulder to push uphill to say he was clearly erroneous and say it was so proximal cause. But their argument is he applied the wrong standard, and that then went him down a whole path that got us off track. And even though that's the order in which he wrote the opinion, Your Honor, he still makes specific factual findings. He does not stop with the Oregon presumption. I think there would be some logic to the argument of Ingram if he had stopped at that part of his opinion and then moved on to damages, but he didn't. He said, moreover, I find this testimony to be highly credible. I find that on these facts there was negligence, and Ingram was solely responsible. Now, he is taking account of the width of the bridge. He did admit into evidence the Truman-Hobbs reports. He did rule pretrial that Dana Goward would be allowed to testify about the content of the Truman-Hobbs report, and Mr. Goward did so for some three or four hours at trial. The judge repeatedly stated that he was considering the evidence about the bridge that makes it a difficult passage. But the question still becomes, on this day, under these facts, you have nine barges, not 15. They're empty. They're not loaded. You have a river current that is relatively normal. There's no issue here of abnormal winds. It's 10 to 15 miles an hour per the testimony. All of these things are foreseeable, and the normal approach to this bridge, Judge, is to the right side, allowing the current to carry you over to the left. There isn't a pier on the right side that obstructs him from doing that. He was off by a country mile, and he was nowhere close to where he should have been. For a pilot of reasonable skill on this fact pattern, it's one thing to say that 15 barges loaded are difficult, but it's quite another to say that it's difficult with nine empties going through this bridge. Our expert, Mr. Beacom, testified that that's what he called a bicycle tow. Anybody who can ride a bicycle can push this through, and that's really how it should have been. One argument that Mr. Miller didn't talk about but was in the brief I wanted you to address, if you would, is that, as I understand it, they're at this point not appealing the reasonableness of the repair costs, but they are saying that you could have avoided a lot of those repair costs by a fairly simple fix that you had done on the north end of the pier. Why is that not contributory negligence to put in some concrete there instead of wood? A couple of reasons, Your Honor. First of all, the U.S. Coast Guard is in charge of the protective structures. Anything erected there has to be submitted, the plans, and they have to be approved. So when the south protection cell was wiped out in 2014, the railroad chose to replace in kind, which does not require a special review process. It was a fairly urgent matter because of the fact that you had an exposed pier at that point. It's not self-evident that the Coast Guard would approve concrete at the south end. Coming from the north, as barges come downriver, they have the added momentum of the current, which creates a great deal of kinetic energy coming down at this bridge. The cement structure acts as an obstacle to that. The Coast Guard is balancing interests when it allows the cement because when barges hit the cement, they're apt to break apart. The cabling is apt to break. And so you have an issue here of what do we do. Do we let the barges potentially break apart and possibly spill chemicals if they're chemical barges, or do we use a more forgiving structure which does not cause damage, which is exactly what happened in this case. It's a more forgiving structure. That's a balancing of interests that the Coast Guard has to do in its regulatory role, and it's not self-evident that that's what they would do on this. There was no evidence presented, and Ingram had the burden of proof on that, that the Coast Guard would have approved such a design. Nothing was entered in the record about that, nor was there anything in the record about what the outcome of the accident would be had that design been used. We simply don't know because there was no reconstruction done. So that's how I would answer that, Your Honor. I'd like to address very briefly Ingram's argument based on S.C. Loveland and based on the City of Chicago case. The City of Chicago case involved a bridge owner that had put, in its original plans, covers on some cabling. Those original covers, over time, came off. The exact circumstance is not really stated, but they were gone by the time that the accident happened. So what you have there is a situation where the bridge owner is not in compliance with its permitted plans. The bridge owner has allowed its bridge to deteriorate, and therefore when the accident happened, the bridge owner was found at fault because the bridge as configured that day did not comply with the plans that were submitted to the U.S. Coast Guard. So that's really just a question of compliance with your permit. It's not a question of assessing fault because the bridge is narrow. The S.C. Loveland case was a case where Florida owned a bridge which was downstream from a parked barge, and nobody was attending to the barge. The barge was left to drift, and over a period of several days, the bridge tender became alarmed and called the U.S. Coast Guard several times. But did nothing more than call the Coast Guard and say, hey, we've got a problem here. This thing is going to come down and hit our bridge eventually. The court found in that case that the state of Florida should have done more, that they should have perhaps hired a towboat, moved the barge itself. There's nothing in that case whatsoever about assessing fault based on bridge design. In fact, there is no case where fault has been assessed to anyone, any bridge owner, based solely on the fact of an unreasonable design that was approved by the Coast Guard. And to the contrary, we cited the Tug Go-Getter case, we cited the Willamette case, and the case of Texas and Pacific versus Angola transfer, all of which say that the permit is a complete defense to any argument that the bridge is unreasonable. If the Coast Guard wanted the bridge to be removed, the Coast Guard has the power to do that. They haven't done it. In fact, they haven't even funded the Truman Hobbs money for replacing the bridge in 20-some years. So there isn't really a sense of urgency coming from the regulators on this either. With regard to whether we have a duty to protect our property, Your Honor, the Coast Guard determines not only what the configuration is of the bridge, but during the history of this bridge, the Coast Guard has determined what the protective structures should be for the piers. Over time, a lock and dam system was created on the Mississippi River, which led to the types of barges that we see today. We have 29 locks and dams up and down the river, which allow this barge traffic. And because of that, protective structures had to be erected, including this south protection pier. That is the protection and the reasonable care that the railroad exercises to protect its property. The Coast Guard says and approves this design and allows us to protect our structure in that way. And by doing that, we protect the pier, which in turn lessens any damage that would be involved when it is struck. Had there been no protection pier, we would be talking about a $70 million damage case with the bridge down rather than $276,000. So we are taking reasonable steps. And Ingram's duty argument also leads to a practical problem, I think. If you're going to say that in this case the judge should assess fault because of the configuration of the bridge, does it not hold them that in every case in the future where DM&E claims damages for a bridge strike, there will be some fault assessed? And how does the subsequent case differ from this case? How do you exact a percentage here? How do you determine a percentage? In Kirby, this court said specifically that it would not find negligence per se on the part of a bridge owner. Are you not, if you send this back down and tell the judge to assess fault based on bridge design, establishing a per se rule for this bridge for the future? Is that not exactly what Kirby rejected when it rejected the use of the Pennsylvania rule? You are, in effect, making it every case where there would be comparative fault on the part of the railroad. Your Honor, the railroad is not trying to avoid duties here. The railroad is simply saying that its duties do not include the duty that Ingram wants to attribute to us. And we have complied in every way with our permit. Judge Strand made factual findings which are clearly supported and he should be affirmed. Thank you. Thank you for the argument. Mr. Miller. Your Honor, what Kirby and I&M tell us collectively is that the Coast Guard's findings don't change maritime law. The Oregon presumption still applies and the finder of fact still decides comparative fault to include any shortcomings of the bridge. We disagree with the characterization of the city of Chicago case. I'm not aware of a permit violation in that case. I thought the discussion was regarding common law duty of fault. And in that case, we had a vessel that actually strayed outside of the permitted space at the passage into a recessed area in the pier. And the court noted that the bridge owner had failed to put up fencing to protect even against that damage to its cables, which were on its own, within its own property, within its own space. Turning to Tug Go-Getter. That was an Oregon District Court opinion addressing counterclaims of negligence against the state of Oregon. What we're talking about here is a diminution in property owners' damages due to assessment of comparative fault. Also, Go-Getter involved a state-owned bridge, and the court held that to find against the state and award damages against the state, it would have to find that the bridge's existence was so unreasonable as to be a denial of due process. They noted there was no claim that permitting authorities had prior to the day of the collision ordered structural changes. In our case, of course, they had. They had ordered the widening of the bridge. And the Go-Getter Court specifically made a finding of fact that the bridge owner was not negligent. So we don't see that here. In the present case, the judge, he did consider the elision proof, what he called the other evidence. But then, as you noted earlier, he then dismissed out of hand as a matter of law all that proof because of the permit. In closing, even if this court views the judge's findings of fact regarding the accrued negligence as an alternative ruling, we're still left with the pronouncement of law, and it's quite far-reaching. It essentially wipes out the opportunity for comparative fault, even in the limited extent of diminishing the bridge owner's damages in elision cases. And arguably, he's gone well beyond anything in Sierra Club or elsewhere to almost create a conflict between the executive branch and the judicial because what that argument comes down to . . . Counsel, your time has expired. Thank you. Okay. Case number 18-2143 is submitted for decision by this court. Ms. McKee.